S. Samuel Di Falco, J.
Petitioner, the trustee under an indenture of trust dated July 29,1935, made by one Alexander R. Nicol, instituted this proceeding, pursuant to article 79 of the Civil Practice Act, for the judicial construction of said trust indenture and for the judicial settlement of the intermediate *900 account of the proceedings of said petitioner. Upon the return, several issues were raised requiring inquiry as to the intent of the settlor at the time he executed the trust indenture. The issues involve interpretation of the word “ issue ” as used by the settlor in the context of his trust indenture against the background of the then existing facts and circumstances. The parties have stipulated, with the approval of the court, that examination and settlement of petitioner’s accounts shall be deferred until after the court has made its determination construing the indenture in respect of the issue raised, since it may develop, as a result of such construction, that certain of the respondents may then have no interest in the trust.
The provision of the indenture with which we are principally concerned is article “ First ”, which provides the following:
‘ ‘ First: To receive, hold, manage, sell, invest, and reinvest the same and every part thereof, in the manner hereinafter specified, and to collect, recover and receive the rents, issues, interest, income and profits thereof, hereinafter called ' Income ’, and after deducting the commissions of the Trustee as hereinafter provided, and the proper and necessary expenses in connection with the conservation and administration of the Trust, to pay the same in monthly installments of equal amount, or as nearly equal as possible, as follows :
“ Ten (10) per cent unto Carlyle Forrest Nicol (son of said Alexander R. Nicol) during his life, and after his death, equally unto and between Carlyle Forrest Nicol, Junior and Nancy Nicol (children of said Carlyle Forrest Nicol, and grandchildren of said Alexander R. Nicol), and unto the survivor, in event the deceased grandchild leaves no issue. If the deceased grandchild leaves issue, his or her share shall be paid to said issue, in equal shares.
“ Ten (10) per cent unto Amelia Ames Nicol (wife of said Carlyle Forrest Nicol), so long as she remains his wife or widow, and in the event of her death or marrying again, equally unto and between said Carlyle Forrest Nicol, Junior, and Nancy Nicol, and unto the survivor, in event the deceased grandchild leaves no issue. If the deceased grandchild leaves issue, his or her share shall be paid to said issue, in equal shares.
“ Five (5) per cent unto and divided equally between Eva Stewart and Edith Stewart (sisters of Minnie E. Nicol, wife of said Alexander R. Nicol), during their lives, and the entire five (5) per cent unto the survivor.
“ Five (5) per cent unto Henrietta Stewart Nicol (sister of said Alexander R. Nicol), during her life.
*901 ‘‘ All the income not disposed of by the foregoing provisions shall be paid equally unto and between Alexander B. Nicol. and Minnie E. Nicol aforesaid, during their joint lives, and unto the survivor, and from and after the death of the survivor, shall be divided into equal parts or shares, and be paid as follows:
“ 1. One (1) share unto Alexander Kenneth Nicol (son of said Alexander B. Nicol), and in event of his death, unto his issue, if any, in equal shares.
“ 2. One (1) share unto Marjorie Nicol MacBain (daughter of said Alexander B. Nicol), and in event of her death, unto her issue, if any, in equal shares.
“ 3. One (l) share equally unto and between Gordon Gilmore Bensley and Bruce Nicol Bensley (grandsons of said Alexander B. Nicol) and unto the survivor, in event the deceased grandson leaves no issue. If the deceased grandson should leave issue, his share shall be paid to said issue, in equal shares.
“ Should all those children, grandchildren and/or their issue entitled to receive and be paid any one part or share of income, as above set forth, die before the final distribution of the principal, as hereinafter provided, then, in that event, the said one part or share of income shall be proportionally divided among and added to the remaining shares or parts then participating in the benefits of this Trust.
“ The Trustee shall retain the principal sum of the Trust hereby created until twenty (20) years after the death of the last surviving child or grandchild of said Alexander B. Nicol, living at the date of this Indenture, but in no event later than January 1, 1990, and shall then divide the same, after payment of all proper charges, into as many shares of principal as there are issue of said Alexander B. Nicol, then surviving, and shall then convey, assign, transfer, set over and deliver unto each of said survivors, one equal share of the principal of said Trust Estate. In the event none of the lineal descendants of said Alexander B. Nicol should be alive at the date of the termination of this Trust, the Trustee shall then convey, assign, transfer, set over and deliver the said Trust Estate in its entirety, unto The Theological Seminary of the Presbyterian. Church in the TJ. S. A., at Princeton, New Jersey, or to its successors, to be known thereafter as the Alexander B. Nicol Fund, the income from which shall be used for the general expenses of the Seminary. ’ ’
The need for a construction at this time results from the deaths of Eva and Edith Stewart and Henrietta Stewart Nicol —-which requires a determination as to the disposition of income formerly payable to them — and the fact that, as a result of the *902 deaths of the settlor, his wife and Marjorie Nieol MacBain, income is payable under subparagraph (2) of article First to the latter’s issue, who now include a child, Muriel M. Bowdoin, and two infant grandchildren —• which requires a determination whether the term “ issue ”, as used in said subparagraph, means “ issue per stirpes ”, in which case Muriel M. Bowdoin alone is entitled to the income payable thereunder, or “ issue per capita ”, in which case Muriel M. Bowdoin and her two children are now entitled to such income, in equal shares.
Since a determination as to the meaning of the term “ issue ” as used in subparagraph (2) will affect, if not determine, the interpretation of such term as it appears elsewhere in article First, petitioner has named as respondents in this proceeding all living persons conceivably interested in the trust and requests the court to determine the meaning of the term “ issue ” wherever it appears in said article.
Because Alexander Kenneth Nieol, one of the beneficiaries of the trust has adopted children, petitioner also seeks a determination as to whether the term “ issue ” as used in article First includes adopted persons and the descendants of such adopted persons.
The term “ issue ” appears in many places in said article First. Since the instrument must be considered as a whole, a determination as to its meaning in one place will of necessity require consideration of its meaning in others.
The questions ’ to which the trustee as well as the parties concerned seek guidance of the court are summarized as follows:
1. "Who are the persons now entitled to receive the income formerly payable to Eva and Edith Stewart and Henrietta Stewart Nieol?
2. Does the term “ issue ”, as used in article First of the indenture, mean “ issue per stirpes ” or “ issue per capita ”, and if it means the latter, when are the persons making up the class to be determined?
3. Does the term “ issue ”, as used in said article include adopted persons and the descendants of such persons?
Four guardians ad litem have heretofore been appointed to represent the interests of the various infant respondents. Since conflicting interests are represented and diverse positions have been taken as to the facts and law applicable, it is necessary, for clarity, to set forth the respective parties. Irving M. Rosen, Esq. is the guardian appointed to represent Virginia R. Nieol and Arthur A. Nieol (children of Carlyle Forrest Nieol, Jr., deceased). Orrin Gr. Judd, Esq. represents Paul Neal Taylor, et al. (children of adopted children of Alexander Kenneth Nieol). *903 Raphael P. Koenig, Esq. represents Alexandra Bowdoin and Geoffrey David Bowdoin (grandchildren of Marjorie Nicol MacBain). David L. Schreiber, Esq. represents Wendy Nye Bensley and Peter Durant Bensley (children of Gordon Gilmore Bensley) and Lisbeth Richards Bensley and Bruce Nicol Bensley, Jr. (children of Bruce Nicol Bensley).
By article Eleventh of the indenture, it is provided that ‘ ‘ this instrument shall be construed and regulated by the laws of the State of New Jersey ”. The trust agreement was executed by the settlor in Summit, New Jersey, where he resided. All of the guardians are in accord that the indenture should be construed by this court in accordance with New Jersey law, except that Mr. Judd also urges that with respect to the interests of his wards the law of adoption in other jurisdictions, particularly California, may require consideration. There is no question in my mind but that in construing the indenture the law of New Jersey must control for the positive direction contained in the trust instrument to the effect that “ this instrument shall be construed and regulated by the laws of the State of New Jersey ” must prevail (Shannon v. Irving Trust Co., 275 N. Y. 95; City Bank Farmers Trust Co. v. Meyn, 263 App. Div. 671).
Considering now the questions for construction, we find that in respect of the disposition of income formerly payable to Eva and Edith Stewart and Henrietta Stewart Nicol, Mr. Rosen argues that the indenture does not make any provision for payment of the income formerly payable to Eva and Edith Stewart and Henrietta Stewart Nicol and that, in such event, New Jersey law requires the accumulation of such income until the termination of the trust. The three other guardians, however, take the position that such income is now payable to the persons entitled to shares of income pursuant to subparagraphs 1, 2 and 3. Their arguments, summarized, are:
1. The settlor, in disposing of 30% of the income and then providing that" All of the income not disposed of by the foregoing provisions ” should be paid to him and his wife and after their deaths to others, intended by the quoted provision to dispose of the remaining 70% of the income and, in addition, any part of the 30% of income which should lapse during the term of the trust by reason of the death of an income beneficiary thereof.
2. Such intention is further evidenced in the next to the last paragraph of article First by the provision for the disposition of income commencing “ Should all those children, grandchildren and/or their issue entitled to receive and be paid any one part or share of income, as above set forth, die before the final distribution of the principal * * * ” This provision, it is *904 argued, refers only to those persons described in subparagraphs 1, 2 and 3. The persons entitled to the first 30% of the income were not referred to because the disposition, upon their deaths, of the income payable to them during life was already provided for by the paragraph beginning “ All of the income not disposed of by the foregoing provisions * * * ”.
3. There is no indication of an intention that the gifts of 20% of the income in the first two paragraphs of article First were to be increased in the event of the deaths of Eva and Edith Stewart or Henrietta Stewart Nicol. It is reasonable to assume the settlor intended that if he survived such persons, their share of the income should come to him.
As to the term “ issue ”, the guardians are in dispute on this question. Messrs. Judd and Koenig take the position that the term ‘ ‘ issue ” is to be construed as ‘1 issue per capita ’ ’ throughout article First. In summary, their arguments appear to be as follows:
1. Under the New Jersey law, the term “ issue ”, unless a contrary intention appears in the trust instrument, means “ issue per capita ”. Mr. Koenig urges that such contrary intention must be specifically expressed.
2. While admitting that some New Jersey cases have construed the term to require a per stirpital distribution, particularly where the instrument provides that issue are to take “ their parent’s share ”, they distinguish those cases because here there is no inference in the instrument to a “ parent’s ” share. Mr. Judd, however, apparently feels that the case for a per capita distribution is stronger in the case of principal than in the case of income.
3. Mr. Koenig also urges, although the reasons for same do not appear to be completely clear, that the next to the last paragraph of article First indicates that the settlor intended a per capita distribution,
Messrs. Eosen and Schreiber, taking the opposite view, at least so far as the disposition of income is concerned, argue as follows:
1. WHiile apparently conceding that under New Jersey law “ issue ” prima facie means “ issue per capita ”, they refer to New Jersey cases which hold that if there is doubt as to the settlor’s intention, a per stirpes distribution is favored.
2. Mr. Schreiber contends that the settlor made a per stirpes distribution to the four named grandchildren, Gordon Gilmore Bensley, Bruce Nicol Bensley, Carlyle Forrest Nicol, Jr. and Nancy Nicol, and that it would be unreasonable to treat other *905 grandchildren, i.e., the children of Alexander Kenneth Nicol, if any, and of Marjorie Nicol MacBain differently.
3. Both Mr. Rosen and Mr. Schreiber contend that those decisions directing a per stirpes distribution where reference is made to a “ parent’s ” share are applicable here, on the ground that while the phrase “ parent’s share ” is not used by the settlor, the shares which the issue of the four named grandchildren are to take are “ delineated as to that which their parents formerly enjoyed ”.
4. Mr. Schreiber further emphasizes the difference in language in respect of the distribution of income and principal, believing that the settlor’s use of the term “ issue ” in the case of principal clearly indicates that principal is to be distributed per capita and believes the difference in language indicates that the settlor intended a per stirpes distribution in the case of income.
As for the trustee, the Bank of New York, while it states it has not taken a position here with respect to the distribution of principal, nor with regard to the questions as to the rights of the adopted children and their descendants, it has nevertheless made pertinent reference to those matters. It believes that, as to the distribution of principal, the settlor intended that the income be distributed per stirpes. As to the question whether the adopted children and their descendants are included in the term “ issue ”, the trustee believes evidence should be taken as to the intent of the settlor, as urged by Mr. Judd.
This then is a summarization of the problems presented upon the return date of this application, as expressed in oral argument of respective counsel and presented in their extensive memoranda of law. Upon the oral argument in open court, it was requested by the petitioner, as well as several of the guardians herein, that the court consider extrinsic evidence in arriving at its decision as to the settlor’s intention; that in the interests of the involved adopted persons and their infant descendants the court consider all relevant and competent evidence bearing upon the settlor’s intention. It was then agreed between all counsel and guardians and stated of record that whatever affidavits and letters or documentary proof Mr. Judd (guardian ad litem for Paul Neal Taylor, et al., who are the adopted children of Alexander Kenneth Nicol) might offer as evidence of settlor’s intention to include these adopted persons in his trust indenture within the class designated by the word “ issue ”, may be considered by the court with the same force and effect as though evidence had been taken thereon and the *906 truth of the matters therein stated be accepted — with the exception that the relevancy thereof was not thereby admitted. It further appears that by stipulation dated February 15, 1955, signed by all parties to this proceeding, it was agreed in substance as follows:
1. That in lieu of oral testimony, any guardian herein might bring such evidence before the court by way of affidavit, without prejudice to the right of any party or guardian to object to the relevancy, materiality or competency of such evidence, and
2. That petitioner will file a copy of the will of settlor, Alexander B. Nieol, which may be considered in evidence and given the same effect as if proved as required by the Civil Practice Act, subject to the right of any guardian to contest its relevancy or materiality.
Accordingly, the petitioner herein has filed the will of Alexander B. Nieol and the guardian for the descendants of adopted children of the settlor’s son, Alexander K. Nieol, has filed the affidavits of said Alexander K. Nieol, his wife, Frances May Nieol, and S. L. de Vausney, an officer of petitioner herein. By said affidavits it is sought to establish and convince this court that the settlor intended to include the adopted children and their descendants as beneficiaries of his trust. Before I pass on to other considerations, I believe, in the interests of continuity, it would be best at this juncture to pass upon the objection presented which contends that such evidence is barred by section 347 of the Civil Practice Act. I am of the opinion, and therefore hold, that the testimony of Alexander Kenneth Nieol and Frances May Nieol is not barred by section 347 of the Civil Practice Act and that the evidence of acts or statements subsequent to the date of the trust indenture is relevant as bearing upon the intention to include adopted children among the beneficiaries of the trust indenture. A study of the section shows that it refers to “ a party or a person interested in the event, or a person from, through or under whom such a party or interested person derives his interest or title by assignment or otherwise ” (italics supplied). It is quite evident that neither Alexander Kenneth Nieol nor Frances May Nieol has any personal interest in the outcome, and the pertinent reported cases on this subject, hereinafter stated, indicate that neither of the affiants is a person “ from, through or under whom ” the infants derive their interest ‘ ‘ by assignment or otherwise ’ ’. Section 347, being a statute which excludes otherwise relevant evidence, must be confined to its precise language. In Eisenlord v. Clum (126 N. Y. 552, 558) it is stated that: “ All legislation on the subject has been in favor of greater liberality in the rules *907 relating to the competency of witnesses.” (See, also, Godine v. Kidd, 64 Hun 585; Ward v. New York Life Ins. Co., 225 N. Y. 314; Albany County Sav. Bank v. McCarty, 149 N. Y. 71, 86.)
Since matters respecting the admissibility of evidence are governed by the lex fori (United States Mtge. & Trust Co. v. Ruggles, 258 N. Y. 32, 40; Restatement, Conflicts of Laws, § 597, New York Annotations [1935], p. 363), the New York law governs and here we find that evidence of acts or statements subsequent to the date of the trust indenture is relevant as bearing upon the intention of the settlor to include adopted children among the beneficiaries of the trust indenture. In Wigmore on Evidence (vol. 9 [3d ed.], § 2458, p. 181), it is stated that: “ The mutual standard of parties to a bilateral act, and for wills the individual standard of the testator, is constantly conceded to control; and it then becomes necessary to search among the prior and subsequent utterances of the party or parties to ascertain their usage, or fixed associations with the terms employed.” (Italics supplied.) Testimony of statements after the execution of a trust was received in Matter of Rudolph (123 N. Y. S. 2d 731) to show that a remainder to “ children ” of the life tenant was intended to refer to the children of her first marriage only, to the exclusion of children of the second marriage.
While I have overruled the objection which urged section 347 of the Civil Practice Act as a bar to the proof offered, after consideration of the will and the affidavits submitted, I am nevertheless not persuaded with the proof. The affidavits in my opinion, completely fail to establish any intention on the part of the settlor to benefit in any manner whatsoever either the adopted children of his son Alexander, or the descendants of said adopted children. On the contrary, I find that the affidavits are truly compatible with the intention of the settlor, as expressed in his trust agreement, to give the bulk of his estate to his blood descendants. Analyzing the affidavit of Alexander K. Nicol, he refers to his marriage in 1939 to Frances May Taylor, who at that time was the mother of the four persons whom he adopted thirteen years later in 1952. Alexander states that he has treated them as his own children and that there is no issue of this marriage to Frances May Taylor. He further states that in 1941 he consulted a lawyer about adopting Ms said wife’s children, but was advised that due to the difficulty of locating his wife’s first husband and obtaining his consent, no proceedings were taken until 1952, after the California adoption law was amended to facilitate the adoption of adults. Mr. Nicol then tells of the adoption proceedings and gives the names and birth dates of the children of said adopted children. He *908 states that in his correspondence with his father (the settlor) over the years, his father expressed an interest in his wife and her children and affectionate regards for them; that when he with his wife visited his father in 1941, his father said it would be a good thing to adopt his wife’s children “ so that they can be considered your children for all legal purposes ”; that in June of 1950 he and his wife again visited the father and spent two weeks at his home during which time Alexander expressed the thought that recognition of his adopted children as issue entitled to share would conform with his father’s wishes, and that he never heard his father express any disapproval of adoption.
The affidavit of Frances May Nicol refers to her prior marriage, children and divorce and the proceedings leading to the adoption of her four children by Alexander. She refers to the 1941 and 1950 visits with the settlor and of a visit she had with him in New Jersey in 1945 when the settlor was very cordial and “ seemed to enjoy my company ”. She also refers to the settlor’s views on adoption, expressed, as Alexander stated, at the 1941 meeting, at which time she says he stated it would be a good thing to bind herself, her husband and the children closer together as a family unit. She further states that during her visit with the settlor in 1945 he told her he thought it was a nice gesture for Dr. Bensley to adopt the child of his second wife since it showed his (Dr. Bensley’s) affection for the child. She concludes by stating that in 1948 or 1949, the settlor wrote to her asking if she would care to come to New Jersey to live with him and take care of him; she declined with regret because of her commitments in California.
Mr. S. L. de Vausney, a vice-president of the Bank of New York, avers that at the time of the creation of the trust he had a conversation with the settlor, the substance thereof being embodied in a memorandum signed by Mr. de Vausney, reading in part as follows: ‘ ‘ Mr. Nicol advised us that he has no personal attorney and that he drew the deed himself, although it has been examined by counsel for a trust company. ’ ’
This then comprises the extrinsic evidence which, it is claimed constitutes sufficient and persuasive evidence and declaration of the settlor’s intent to include in his trust, within the contemplation of the word therein “ issue ”, the adopted children of Alexander and the children of those adopted children so that they would thereby share in that portion of the trust set up for Alexander.
Appraising and evaluating the facts presented in these affidavits I find them utterly lacking in force and effect for the *909 contentions urged by Mr. Judd. It does not appear from the affidavits that the settlor had ever met or even corresponded with either the adopted children or their children. The affidavits of Alexander and his wife Frances deal solely with events commencing in 1939, their first meeting with the settlor being in 1941. It must be kept in mind that the trust indenture was executed in 1935. There is nothing in the affidavits to show that in 1935, or in the few visits in 1941, 1945 and 1950, that the settlor had any intention of including the adopted children or their descendants within the orbit of his bounty by the trust. That he regarded his son’s wife with affection is only natural and his alleged statement that his son should adopt the children of his wife “ so they can be considered your children for all legal purposes ” is logical and reasonable with the natural desire of a father to see his son happy in a new family relationship. But again we must be mindful of the established and uncontrovertible fact that this trust indenture was made and executed in 1935. It cannot be said, with any degree of reasonable certainty, and certainly there is nothing at any time to even imply it, that in 1935 when the settlor executed the trust indenture he envisioned his expressed beneficiaries might or would adopt children who he then intended should be the ultimate beneficiaries. Whatever was done, as here claimed, was done after the death of the settlor. The adoptions took place after the death of the settlor. The inferences here sought cannot be related back to the date of the creation of the trust in 1935. Alexander married Frances in 1939. At the time of the marriage her children were of the ages of 15, 17, 18 and 19 years. It was not until after the death of the settlor (in 1951) that Alexander did adopt said children. This was in 1952 and by this time said children were now adults of the ages 28, 29, 30 and 31. And this was now seventeen years after the execution of the trust indenture. These adult adopted children have presently a total of ten children who are the infants here represented by Mr. Judd.
Of further significance negating the contention here urged by way of the affidavits discussed, is the following observation regarding the will executed by the settlor in 1950, the year before he died. Nowhere in the will are either the four adopted children nor any of their many children mentioned or provided for. The will does leave to Frances, Alexander’s wife, the sum of $1,000. Although the will benefits the several grandchildren and great grandchildren (blood descendants) of the settlor and specifically Frances, the mother of the four adopted children, it makes no reference or provision whatever for said *910 adopted children or their descendants. If the settlor made itd provision for them in 1950, after having formed the attachment for their mother as alleged, there does not appear to me to be any justification nor warrant in the proof to impute a contrary intention to the settlor going back to 1935 when they and their mother were unknown to him. Had the settlor desired or intended to include these children within his expression of ‘ ‘ issue ’ ’, he could readily, in 1953 (11 years after Alexander’s marriage), when he made his will, have made provision or expression for said children. It is urged that Alexander treated these adopted children and their descendants as his own. But, there is no adequate proof to establish a determination by this court that the settlor considered them as his ‘ ‘ issue ’ ’ within the contemplation and language of his trust indenture. There is no ambiguity in the indenture.
The word “ issue ” standing alone, is deemed to be used in its primary, legal sense of blood descendants, lineal descendants or offspring. The word “ issue ” does not include persons adopted after the execution of the indenture by others than the settlor. Under the decisional law of the State of New Jersey these adopted children and their descendants were not and may not be considered within the contemplation of the term “ issue ” as used here. In the Matter of Fisler (131 N. J. Eq. 310) the. court, in construing a will providing for a gift to the ' ‘ lawfful issue ’ ’ of another so as to exclude an adopted child as a substitute taker, where the adoption took place after the death of the testator, said (p. 329): “ The presumption that a testator who makes provision for a child, or children, or issue of another, did not intend to include an adoptive child unless other language in the will makes clear a contrary purpose, must now be accepted, I am convinced, as established law in this state. Indubitably then, where an adoption, to which the testator is a stranger, occurs after the execution of the will and after the decease of the testator, the adoptive child cannot take.”
In affirming this decision, the Court of Errors and Appeals said (Matter of Fisler, 133 N. J. Eq. 421, 422): “ We are in accord with the conclusion * * * . The opinion in this behalf is well-reasoned and altogether sufficient.”
In Fidelity Union Trust Co. v. Potter (8 N. J. Super. 533, 539) the following is stated: “Generally, the word ‘issue’ does not include an adopted child. The question, however, is essentially one of intention, which may be gathered from a construction of the entire instrument and an examination of the surrounding circumstances.” (See, also, Fidelity Union Trust Co. v. Hall, 125 N. J. Eq. 419.)
*911 The New York law is in accord. In New York Life Ins. & Trust Co. v. Viele (161 N. Y. 11) the court held that a gift to the ‘ ‘ lawful issue ’ ’ of the first taker did not include a child adopted by said beneficiary and said (p. 20): “ We think that the context of the instrument shows quite clearly that she used these words in their primary and general sense as including descendants and not children by adoption.”
In Matter of Charles (200 Misc. 452, affd. 279 App. Div. 741, affd. 304 N. Y. 776) it was said (p. 460): “Where, however, there is a gift over in the absence of children the adversity of interest which exists is not between natural children and those by adoption or the latter and intestate distributees but between adopted children and specified remaindermen chosen by the testator himself. In that case, the fourth paragraph of section 115 of the Domestic Relations Law, is directly applicable (Matter of Leask, supra; Matter of Hopkins, supra). To allow adopted children to participate in the assets under those circumstances it must be demonstrated that the testator intended a result contrary to that prescribed by statute and intended to include such children within the gift (Matter of Leask, supra). There must be an affirmative showing not of an intention to use the word ' children ’ in its general signification but of a positive intention to permit adopted children to take to the exclusion of named remaindermen. Where such remaindermen are selected by the testator himself, the Legislature has assumed that such persons would be preferred by the testator over adoptees.”
The exception being statutory, it will be strictly construed (Matter of Charles, supra; Matter of Guaranty Trust Co. of New York, N. Y. L. J. May 27, 1955, p. 7, col. 4). While there is indicated in recent years a growing favor towards adopted children, the law nevertheless requires that an adopted child may not inherit from the next of kin of its foster parents (Matter of Hodges, 294 N. Y. 58; see Matter of Denton, 195 Misc. 938, 941; Matter of Guaranty Trust Co. of New York, supra). In Matter of Bankers Trust Co. (Davis) (133 N. Y. S. 2d 525) it was stated (p. 527): “ the question presented is who of the survivors are the ‘ issue ’ of Frederick A. W. Davis. It appears that in the absence of an expressed intention to the contrary a limitation in a deed of trust to a child or children conditioned upon survivorship does not include an adopted child where the grantor is a stranger to the adoption. Matter of Leask, 197 N. Y. 193, 90 N. E. 652, 27 L. R. A., N. S., 1158; Matter of Upjohn’s Will, 304 N. Y. 366, 107 N. E. 2d 492. The deed of trust here involved was executed May 12, 1909; the *912 grantor died February 9,1910; and the adoption of Edith Marie Thompson Davis was effected by decree dated October 5, 1943. There do not appear to be present circumstances from which can be attributed to the grantor the intention to embrace an adopted child of Frederick A. W. Davis within the meaning of the term ‘ issue ’ of the deed of trust.”
In conclusion therefore, my ultimate determination, upon the facts presented and applicable law, is that the adopted children and their descendants are not embraced within the term ‘ ‘ issue ’ ’ of the trust indenture and can receive no benefit thereunder. This question therefore being determined adversely to these children, the other two questions relating to (a) per stirpes or per capita consideration, and (2) to income, thereby become academic as to them and need no further consideration since they would not qualify as beneficiaries of the trust instrument in any event.
I come now to consideration of the issues, as to which construction is sought, as follows:
1. Whether the income formerly payable to the settlor’s sisters-in-law, Eva Stewart and Edith Stewart, and his sister, Henrietta Stewart Mcol (which I will hereinafter, for the sake of brevity, refer to as the “ undisposed of income ”) is payable only to those beneficiaries designated in the subparagraphs numbered “ 1 ”, “ 2 ”, and “ 3 ” of article First, or proportionately to all income beneficiaries.
2. Whether said beneficiaries will share therein in a per stirpes or per capita basis.
I determined at the outset of this decision that the law of the State of New Jersey is applicable and controlling here. I might here state, for later clarity, that the settlor’s wife Minnie died on May 24, 1939; the settlor died on March 2, 1951; Carlyle Forrest Nicol, Jr., the grandson of settlor, is deceased as are also the settlor’s sister Henrietta and his wife’s sisters Eva and Edith Stewart.
In approaching consideration of the disposition of the settlor’s property by his trust indenture, we must study the instrument as a whole in order to arrive at a conclusion respecting his intentions. By the gifts of 10% of income to his sister and sisters-in-law, the settlor made it perfectly clear that he intended that upon the death of said beneficiaries their undisposed of income should revert to himself and his wife, or survivor; otherwise to the beneficiaries who are, under the terms of the indenture, entitled to take the income theretofore reserved to the settlor and his wife. The method of distribution is set up pimply. He first provided for 10% to each of his son Carlyle *913 and Ms son’s wife Amelia, took into consideration their eventual deaths by substituting gifts to their two named children and their issue, gave the next 5% to his sisters-in-law, Eva and Edith Stewart and the survivor, and 5% to his sister Henrietta, for life, but significantly he did not provide for any gifts over of their said shares of income. The 5% to his sisters-in-law is to “ the survivor ”, and the 5% to his sister is “ during her life ”. The settlor then provided with respect to the balance of the income as follows: “All the income not disposed of by the foregoing provisions (italics supplied) shall be paid equally unto and between Alexander R. Nicol and Minnie E. Nicol aforesaid, during their joint lives, and unto the survivor, and from and after the death of the survivor, shall be divided into equal shares, and be paid as follows: ”
In paragraph “ 1 ” immediately following, settlor gave one share thereof to his son Alexander and on his death, to his issue, in equal shares; in paragraph “ 2 ” the settlor made an identical gift of one share to his daughter Marjorie, and her issue; and in paragraph “ 3 ” the settlor gave one share to his grandsons Gordon and Bruce.
It is clear to me and I am persuaded to the conclusion that when the settlor used the phrase “ all the income not disposed of by the foregoing provisions ”, he meant what he literally said. By the very terms of the immediately preceding paragraphs, income was undisposed of. Those shares of the settlor’s sisters-in-law and sister, which were specifically limited to life estates have no provisions for gifts over upon their deaths. With respect to the shares of his sisters-in-law, he was careful to point out that 5% was to be divided between them during their joint lives, with the whole amount payable to the survivor; as to his sister’s gift, that was only payable “ during her life ”. In the face then of such specific particularity, the logical conclusion to be ascribed to the above-quoted phrase used by settlor is that he intended thereby to provide further disposition of these income shares upon their deaths. Thus these shares were treated as undisposed of income upon their deaths and the takers of such income were the settlor and his wife, and the beneficiaries mentioned in paragraphs “ 1 ”, “ 2 ” and “ 3 ”. Further evidence of tMs intention to reserve all undisposed of income for the three lines of descent provided in paragraphs “ 1 ”, “2” and “ 3 ” of article First, and not to increase the shares of the grantor’s son Carlyle and his wife beyond the 20% initially given them, is revealed in the following provision stated in the paragraph immediately following “ 3 “ Should all those children, grandchildren, and/or their issue entitled *914 to receive and to be paid any one part or share of income, as above set forth, die before the final distribution of the principal, as hereinafter provided, then, in that event, said one part or share of income shall be proportionately divided among and added to the remaining shares, or parts then participating in the benefits of this trust (Italics supplied.)
This provision thus clearly and unambiguously states that it applies only to the gifts under the immediately preceding paragraphs “ 1 ”, “ 2 ” and “ 3 ”. It refers to “ a part or share of income, as above set forth ’ ’— only the gifts under said preceding paragraphs are given in terms of “ parts and shares ”, all other preceding gifts being in terms of percentages. Moreover, in identifying the group, settlor mentioned only “ children, grandchildren and/or their issue ”, thus excluding all takers of percentage gifts which include a daughter-in-law as well as sisters-in-law and a sister. It is evident therefore that the settlor in no event intended any of the percentage gifts to be augmented, at least until there was a failure of issue in any of the said three lines of descent, which has not, in fact occurred. I conclude and find therefore that it was the manifest intention of the settlor that the undisposed of income resulting from the deaths of his sisters-in-law and sister should become part of the income shares given to the class of beneficiaries designated under paragraphs “ 1 ”, “2” and “ 3 ”. I am not in accord with the contentions of Mr. Eosen who urges that this part of the income belongs to the residuary principal to be accumulated until the termination of the trust and then be distributed as part of the principal thereof. It follows that the 5% income share formerly payable to the settlor’s sister Henrietta, should be paid in three equal shares to the beneficiaries entitled thereto, from the date of her death on November 9, 1951, and the 5% share of income formerly payable to the settlor’s sister-in-law Edith Stewart, as survivor, is also payable in equal shares to said beneficiaries, from January 15, 1952, the date of Edith’s death.
The distribution of the undisposed of income should be on a per stirpes and not per capita basis. This appears to be the predominant intention of the settlor, that “ issue ” of the income beneficiaries shall be limited in its meaning to the children of said beneficiaries who collectively take their parent’s share, and shall not include descendants in whatever degree of living children. In this connection we find that the courts of the States of New Jersey and New York lean toward a per stirpes distribution as being the more equitable one. The policy of the courts of the State of New Jersey are aptly expressed as *915 follows in Stoutenburgh v. Moore (37 N. J. Eq. 63, 71, affd. 38 N. J. Eq. 281): “ If it is doubtful whether he intended the distribution among Ms grandchildren to be per stirpes or per capita, the court should adopt a construction in favor of the former method, not only as being most probably in accordance with his intention, but also as being in accordance with the policy of the law.” (See, also, Central Hanover Bank & Trust Co. v. Helme, 121 N. J. Eq. 406, 417.)
The substitutional gifts made by the settlor to ‘ ‘ issue ’ ’ indicated that he intended equality among his grandchildren. The gift of 10% to his son Carlyle, passes in death “ equally unto ” settlor’s grandchildren Carlyle, Jr., and Nancy, and “if the deceased grandchild leaves issue, his or her share shall be paid to said issue, in equal shares ”. In the gift of 10% income to Amelia the identical provision is made for the same grandchildren. The gifts of income to the settlor’s son and daughter under paragraphs “ 1 ” and “2” pass to their issue “in equal shares ”, and the income under paragraph “ 3 ” is payable “ equally ” to settlor’s grandsons, Gordon and Bruce, and “ if the deceased grandson should leave issue, Ms share shall be paid to said issue in equal shares ”. Thus, in maMng substitutionary gifts to Ms four grandchildren, who were the only grandchildren in being at the time when the trust agreement was executed, the settlor was careful to point out that these gifts were made to them “ equally”. And when he provided that the shares of income of said grandchildren should pass to their issue “ in equal shares ”, he meant equality among his greatgrandchildren. It would be unreasonable to suppose that the settlor intended to treat unborn grandchildren differently from those in being. Therefore, when he gave the income shares of his children Alexander and Marjorie upon death to their ‘' issue, if any, in equal shares ’ ’ he must be presumed to have meant just what he said — equality among unborn grandchildren as well as living grandchildren. The word “ issue ” then takes the clear meaning of cMldren and the distribution a per stirpital character, and thus rules out a per capita distribution which can result only in inequality. Further evidence of this intent is gleaned from the fact that when issue come to take in equal shares, their shares are delineated as that which their parents formerly enjoyed. Thus, upon the deaths of the settlor’s grandchildren, Carlyle, Jr. and Nancy, he directs that “ Ms or her share ’ ’ shall pass to issue. Similarly as to the gifts to his other grandchildren Gordon and Bruce, he provides that if either of them leaves issue “ his share shall be paid to said issue ”. The courts of New Jersey have adhered to the rule that where *916 ‘ ‘ issue ’ ’ is used in reference to the parent of that issue as by a direction that issue are to take the share of a deceased parent, the word is construed to mean children only and a per stirpes distribution follows (Fidelity Union Trust Co. v. Graves, 139 N. J. Eq. 571; Pierson v. Jones, 108 N. J. Eq. 453, affd. 111 N. J. Eq. 357; Kahn v. Rockhill, 132 N. J. Eq. 188, 194, affd. 133 N. J. Eq. 300; Dennis v. Dennis, 86 N. J. Eq. 423; Coyle v. Coyle, 73 N. J. Eq. 528). In Matter of Fisler (133 N. J. Eq. 421, supra) it was held that the direction that if certain beneficiaries die leaving issue, “ such issue ” shall “ take their parents’ share ” clearly imports a per stirpes distribution.
In light of the foregoing “issue” of income beneficiaries must be construed to mean children, and, distribution accordingly must be per stirpes.
Settle appropriate order consistent with the foregoing.